UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| MANUEL VIEIRA,<br><br>            Plaintiff,<br><br>      v.<br><br>ANDREW SAUL,<br><br>            Defendant. | Case No.  18-cv-04960-RMI<br><br>**ORDER**<br><br>Re: Dkt. Nos. 18, 27 |

Plaintiff, Manuel Vieira, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits under Title II of the Social Security Act.  Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 6 & 10), and both parties have moved for summary judgment (dkts. 18 & 27). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and direct courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On January 10, 2014, Plaintiff filed an application for disability insurance benefits, alleging an onset date of April 30, 2014. *See* Administrative Record "*AR*" at 15.[1] The ALJ denied the application on October 11, 2017. *Id*. at 29. The Appeals Council denied Plaintiff's request for review on June 12, 2018. *Id*. at 1-3.

## SUMMARY OF THE RELEVANT EVIDENCE

Having only an elementary school education, having always lived with his family, and having never managed his own affairs or finances, Plaintiff seeks disability benefits on the basis of an intellectual disorder and other mental impairments. *See* Pl.'s Mot. (dkt. 18) at 6-7. Born in 1965, Plaintiff worked for nearly 30 years as a produce clerk in a grocery store where he was working with family and friends who would assist and coach him in the performance of his job functions. *Id*. at 7. In 2014, due to a series of events including the passing of his father, as well as workplace transfers and promotions, Plaintiff was no longer able to rely on assistance and coaching from his workplace support network. *Id*. Consequently, he began to experience difficulty maintaining his employment as there were complaints about his ability to perform tasks which resulted in his employer reducing his working hours and shifting him between positions and store locations. *Id*. Plaintiff's increasing difficulties in completing tasks and communicating with co-

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-12).

workers and supervisors caused him a measure of anxiety which presented itself in various manifestations, including abdominal pain, and which eventually caused him to leave his place of employment in April of 2014. *Id.*

### *Medical Evidence*

The following month, due to the nature of his persistent anxiety, as combined with his intellectual impairment, Plaintiff's primary care provider, Dr. Linder, referred him to Kirstern Toverud Severson, Ph.D., for clinical psychotherapy treatment. *See AR* at 486-87, 512. Thereafter, Dr. Severson treated Plaintiff in weekly psychotherapy sessions for an extended period of time. *See id.* 491-515. At the outset, Dr. Severson diagnosed Plaintiff with severe single-episode major depressive disorder (possibly manic depressive disorder), borderline personality disorder, dependent personality disorder (possibly histrionic personality disorder), and assed a Global Assessment of Functioning score in the range of 41 to 50. *Id.* at 550. In June of 2014, Dr. Severson concluded that Plaintiff "is at great risk for developing a psychotic episode if he continues to remain in his unhealthy work environment." *Id.* In July of 2014, Drs. Severson and Linder coordinated to optimize Plaintiff's medications, wherein Dr. Severson noted that "[m]y hope is [that] his OCD symptoms will decrease if we increase the fluvoxamine to 100 mg." *Id.* at 554, 556. The following month, Dr. Severson corresponded with Dr. Linder again in order to coordinate their efforts in identifying an appropriate treating or examining provider such that Plaintiff could be subjected to a full battery of psychological and cognitive testing. *Id.* at 551-52.

After a lengthy course of psychotherapy, as well as an extensive effort to coordinate Plaintiff's medicinal regimen with Dr. Linder, Dr. Severson ultimately concluded by mid-2015 that Plaintiff is permanently disabled and unable to return to work due to his mental impairments. *Id.* at 581. By way of explanation, Dr. Severson described Plaintiff as having an abnormally limited ability to control himself, causing him to frequently engage in repetitive, compulsive, or involuntary behavior; as well as manifesting poor concentration and slowness of thinking; and, operating at a level marked by decreased clarity of thought which causes him to experience difficulty finding the right words to use, and difficulty understanding what other people say. *Id.* Dr. Severson opined further that the emotional consequences of Plaintiff's intellectual impairment

are manifested in Plaintiff's anxiety, irritability, frustration, anger, panic spells, emotional overreaction, fear of losing control, feelings of hopelessness, and his recurrent fears, all of which combine to prevent him from being able to function in an employment setting. *Id*. at 583.

More than two years later, in July of 2017, his treatment providers at Pathways to Wellness, a mental health services clinic, noted that Plaintiff continued to suffer from paranoid delusions that involve his persecution by strangers and family alike. *Id*. at 637. Plaintiff's continued rumination in irrational beliefs and distrust only further stoked his obsessive and compulsive behavior, his social isolation, as well as his feelings of hopelessness and his ritualistic behavior such as double checking door knobs, excessively touching objects, and hoarding. *Id*. Treatment records from this period indicate that Plaintiff's relatives are "always fixing broken objects in the house" that were destroyed by Plaintiff's impulsive and compulsive behavior; for example, Plaintiff was reported to have suffered "a meltdown last week, [because] he couldn't understand why his mother who has dementia would urinate on herself." *Id*. at 637, 644. Further, during his psychotherapy sessions, records indicate that Plaintiff manifested a depressed mood with an anxious and constricted affect, and that he experienced thought blocking, periodic vocal tics, stuttering, and psychosis. *Id*. at 637. Accordingly, his treatment providers at Pathways to Wellness opined that Plaintiff had marked limitations in performing activities of daily living, in social functioning, and with regards to episodes of decompensation and increase of symptoms – all of which are rooted in his significant paranoid delusions, his depression, his obsessive compulsive disorder, and the fact that he is developmentally delayed. *Id*. at 640. Plaintiff's target symptoms were noted as including depressed mood, anhedonia, psychomotor agitation, feelings of worthlessness, and psychosis. *Id*. at 640-41. It was also opined that Plaintiff is unable to maintain physical hygiene or to manage his medications, and that he exhibits a "repeated presence of psychotic symptoms" that could manifest in suicidal or violent ideations or acts. *Id*. at 641.

Three years earlier, not long after the initial submission of the disability application that was prepared and filed on Plaintiff's behalf by his sister, he was referred by the state agency for disability determination to Ute Kollath, Ph.D., for a consultative psychological evaluation. *Id*. at 516-20. The evaluation consisted of a clinical interview with Plaintiff and his sister, Ms. Mary

Santos, as well as a review of Dr. Severson's initial consult form, and the administration of a battery of diagnostic tests. *Id*. at 516, 518. Dr. Kollath began by noting that Plaintiff left his job when "it became increasingly difficult to cope with bullying by some of his co-workers," which had caused him to experience increased anxiety and stomach problems. *Id*. at 516. Ms. Santos reported that Plaintiff's paranoia was exasperated by people talking about him at work; and, before he resigned, Plaintiff frequently had to leave work because of his poor stress threshold, his anxiety, and his compulsion towards repetitive actions such as checking and re-checking doors and faucets, all of which interfered with his ability to work. *Id*. at 517. Additionally, Ms. Santos reported that she manages Plaintiff's affairs due to his learning disability and his limited reading and writing skills. *Id*.

Through record reviews, Dr. Kollath noted that Plaintiff had undergone outpatient psychiatric treatment in the past, that he had been prescribed psychotropic medications, that his compliance with those medicinal regimes was fair, and yet that his response to those medications was poor. *Id*. Dr. Kollath also conducted a mental status exam and noted that Plaintiff's "history and clinical presentation is indicative of a neurocognitive disorder." *Id*. at 519. In addition, Plaintiff was subjected to a battery of diagnostic testing, namely the: Folstein Mini Mental State Exam ("MMSE"); Wechsler Adult Intelligence Scale, 4th ed. ("WAIS-IV"); Wechsler Memory Scale, 4th ed. ("WMS-IV"); and both parts of the Trail Making Test ("TMT"). *Id*. at 518.

Plaintiff's MMSE score indicated that he was impaired in the areas of intelligence, attention, and concentration. *Id*. Further, Dr. Kollath's mental status examination resulted in the findings that Plaintiff was emotionally and functionally impaired, that he had a poor fund of knowledge for current events, as well as presenting with an anxious affect and demonstrating a tangential thought process. *Id*. at 518. Plaintiff's WAIS-IV performance resulted in a full-scale IQ score of 51; he scored 40 in the each of the memory index categories of the WMS-IV; and, Plaintiff took 71 seconds to complete the first part of the TMT but was unable to complete the second part. *Id*. at 520. However, without explaining the test results themselves (e.g., what exactly it means to have a full scale IQ score of 51, or a WMS-IV score of 40), Dr. Kollath simply wrote that "[t]hese results are considered to be an unreliable representation of the claimant's current

psychological functioning," a conclusion for which there was also no explanation given. *Id*. at 518. In the end, Dr. Kollath diagnosed Plaintiff with generalized anxiety disorder and borderline intellectual functioning, and opined that Plaintiff was only moderately impaired as to following complex or detailed instructions, completing complex tasks, and adapting to changes, hazards, or stressors in the workplace. *Id*. at 519. Dr. Kollath further opined that Plaintiff was mildly impaired as to maintaining adequate attention and concentration or withstanding the stresses of a routine workday, and that Plaintiff was in other regards unimpaired, but, that he would not be capable of managing his own funds. *Id*.

Finally, in May of 2017, the ALJ requested an opinion from Faren R. Akins, J.D., Ph.D., as a non-examining consultant. *Id*. at 467-70. Dr. Akins reviewed the initial intake form completed by Dr. Severson, as well as the report of the consultative examination performed by Dr. Kollath. *Id*. at 467. After stating, "I feel that I have insufficient information to offer well-informed opinions," Dr. Akins then expressed what can only be presumed to be an ill-informed opinion to the effect that because he could not "give much weight to Dr. Severson's opinions," he was left to rely on Dr. Kollath's report, while noting, "[t]hat's not much to go on." *Id*. at 469. In the end, although he found Dr. Severson's opinions disagreeable, Dr. Akins repeated that his unexplained disagreement with Plaintiff's treating psychologist "seems [to be] a moot point because there simply isn't enough data to infer what claimant's functioning might be in the 12 months following Dr. Kollath's evaluation." *Id*. at 470.

*Hearing Testimony*

On February 14, 2017, Plaintiff appeared for what was the first of two hearings before the ALJ; on this occasion, Plaintiff proceeded without counsel and was represented by his sister, who is not an attorney. *See id*. at 15. The ALJ first attempted to question Plaintiff, but the effort was frustrated by communication difficulties. *See id*. at 46-55. When the ALJ asked Plaintiff why he had stopped working, Plaintiff responded that "[t]he problem is there's too much making stress." *Id*. at 46-47. When the ALJ asked Plaintiff if his coworkers or managers were causing him stress by pressuring him to work harder, Plaintiff responded, "[y]eah, we're working hard, it's good." *Id*. at 47. With that, the ALJ proceeded to question Ms. Santos instead. *See id*. at 46-55, 57-60. In the

6

1   middle of this questioning, Plaintiff interjected and stated that he had a question. *Id*. at 55. The

2   ALJ invited Plaintiff to ask his question, and the following exchange took place:

> PLAINTIFF:   Okay. The time that I told you right now the person gave me the pressure.
>
> ALJ:          Yeah.
>
> PLAINTIFF:   Okay. [inaudible] story is fine [inaudible] and you coming home again, so they got something [inaudible] so the people gave me pressure. So, then I get sick, get the flu I have to get out of there. Then I call my sister, that's not nice, I can't hold it. So, it's the pressure. The other guy say, oh he's just okay [inaudible]. And now he's [inaudible] he's got a person coming watching and looking in the story.
>
> ALJ:          Watching you?
>
> PLAINTIFF:   Yeah. I don't know the person is looking and he look at customers.
>
> ALJ:          Yeah.
>
> PLAINTIFF:   And they say, what are you talking about? They say, oh he wants everything quickly [inaudible], for what? He say, I don't know that's all he wants. He said, what's [inaudible]. And he stand back and he write piece of paper and you do it by yourself. And then [inaudible] she's watching, I don't know, but I don't asking and she's keeping watch maybe somebody else.
>
> ALJ:          Okay.
>
> PLAINTIFF:   That's what I'd like to say.

19   *Id*. at 55-56. Following this exchange, Plaintiff had no further input in the first hearing, and the

20   ALJ resumed his questioning of Ms. Santos and the vocational expert ("VE"). *Id*. at 67-60.

21          On September 6, 2017, at the second hearing, Plaintiff appeared through counsel, and the

22   ALJ heard further from Plaintiff, Ms. Santos, and the VE. *Id*. at 63-119. This time, counsel

23   attempted to elicit testimony from Plaintiff about the pressure he experienced at work. In response,

24   Plaintiff stated that, "I get it from my place [inaudible] sometimes like customer service see or

25   listen or hear about it and stuff and they don't like it . . . [y]eah, they don't like it what they doing.

26   They hear voice, no [inaudible]. What's the guy name? Oh, Mr. Jones [phonetic], no, no, no that's

27   not nice." *Id*. at 71. Counsel responded, "I'm sorry, I'm not sure what you're talking about." *Id*.

28   When counsel asked Plaintiff what happened in 2014 such as to cause him to stop working at the

United States District Court
Northern District of California

grocery store, Plaintiff responded that "[i]t's okay, you're fine, but when you're working more [inaudible] for more people they coming back to you and they [inaudible] you know. They don't like to work like that, so only the customers they don't like the people working like that [inaudible]." *Id*. at 73. Counsel again told Plaintiff that she was struggling to understand what Plaintiff meant, she rephrased the question, and asked Plaintiff if he had been disciplined at work; Plaintiff responded, "[y]eah, yeah. Finished, yeah. When I have to finish something I got to - - sorry, we had a customer service talking to and ask for help and I would help a customer." *Id*. at 73-74. The remainder of Plaintiff's questioning by his counsel and by the ALJ was similarly disjointed and elicited very little information. *See e.g.*, *id*. at 74-89. In fact, the ALJ mused to the following effect during the second hearing: "[s]o, when I was asking your brother some questions just before[,] it was really difficult to understand what he was saying . . . [a]nd[,] like[,] he seems to even have a hard time understanding what I am asking him . . . I'd ask him a question then his response would be as if I would have asked him a different question, so." *Id*. at 96. Ms. Santos responded that this is "part of the nerve thing . . . when he gets nervous all the languages come together and he just - - nobody understands him." *Id*.

In pertinent part, Ms. Santos testified that she is Plaintiff's caregiver. *Id*. at 35. Plaintiff lives with his elderly mother and other relatives (a nephew and his wife). *Id*. at 48. While Plaintiff's nephew takes care of all the household chores, Ms. Santos handles all of Plaintiff's financial affairs because "he has no knowledge of what bills we pay, has no concept of, you know, where the money goes." *Id*. at 48-49, 51, 108-09. In fact, Plaintiff has never lived alone, has never managed his own finances, and has always been cared for by others, including in the workplace setting. *Id*. at 48-49, 51-53. While they were growing up in Venezuela, before Plaintiff dropped out of school in the fifth grade, Ms. Santos testified that because of their parents' refusal to permit the school to label Plaintiff as suffering from an intellectual disability or a cognitive impairment, Plaintiff was taken out of school and put to work with a relative who owned an automobile repair shop. *Id*. at 53. Before dropping out, when Plaintiff would get scores of zero on his school assignments, he would often find himself on the receiving end of beatings at home; Ms. Santos described their parents as "a little abusive at that time, you know, it was allowed at that time." *Id*.

at 107.

Thereafter, Plaintiff's family continued in their refusal to address his mental impairments; instead, they did everything they could to cover it up and to fashion their own accommodations. *Id*. at 44. Thus, until the lead-up to 2014, when Plaintiff felt like he was forced out of his job, Plaintiff spent his entire lifetime living at home, and working under the close care and supervision of various relatives or family friends. *Id*. at 42-43, 52. In a number of positions, at various grocery stores, Plaintiff spent the better part of 30 years working as a janitor and a produce clerk, while being assisted and coached on the job by co-workers who were his relatives or family friends. *Id*. at 42-44; *see also id*. at 90 ("the whole family worked there [] in different departments, so he got in as a janitor [and] then he was promoted to produce because [] a friend of my dad had taken him under his wing."). For most of that length of time, Plaintiff's father "watched everything and controlled everything," but since his passing in 2008, Plaintiff's situation in the workplace began to deteriorate. *Id*. at 43-44. After the remainder of Plaintiff's relatives and family friends eventually found other employment or were promoted to other positions, Plaintiff found himself unguided at work and began to have difficulties performing his job functions and adhering to the dress code. *Id*. at 44. For example, Plaintiff would fail to answer the phone at the produce department "because he didn't know how to answer the phone," despite having been taught several times. *Id*. at 100. This, in turn, caused him to become subjected to obloquy and bullying by his fellow employees, which then caused him to experience increasing frustration, anxiety, and paranoia. *Id*. at 44-45.

As to the effects of the frustration and paranoia, Ms. Santos described it as debilitating – noting that, "[o]nce he gets frustrated, he can't see straight. He can't function." *Id*. at 44; *see also id*. at 109-10 ("It could have been a very small issue, but in his head it was just severe and it just[,] it paralyzes him of doing his work."). Coworkers and mangers at the grocery store then began telling Plaintiff that managers were calling his family to complain about his performance, as well as telling Plaintiff that he was grossly overpaid at $21 per hour, and that "they felt that he [] should not be making that . . ." *Id*. at 44-45. Eventually, Plaintiff's increasing anxiety interfered with his ability to even get himself to his workplace, let alone working a shift while there, as it

9

1   manifested itself in frequent abdominal pain, as well as "you know, he's feeling overwhelmed and

2   he wants to throw up and he wants to go to the bathroom." *Id*. at 45. Given these physical

3   manifestations, Plaintiff's family took him to see Dr. Linder, who then referred him to Dr.

4   Severson. *Id*. at 45-46. Thereafter, Dr. Severson would be Plaintiff's treating psychotherapist for

5   the next three years; and, Ms. Santos noted that "[s]he's been the only one that he felt comfortable

6   with, and even though she was not covered through his medical plan[,] we were paying out of

7   pocket just so that he [] would be able to see her and continue. As you know, it's hard to find a

8   psychiatrist, especially when you're on Medicare." *Id*. at 40-41, 46. With that, Ms. Santos's

9   testimony was concluded, and the VE testified and noted, in pertinent part, that if someone were to

10  be off task 15 to 20 percent of the time, or absent more than one day per month, that person would

11  not be employable. *Id*. at 117-18.

### THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

13      A person filing a claim for social security disability benefits ("the claimant") must show

14  that he has the "inability to do any substantial gainful activity by reason of any medically

15  determinable physical or mental impairment" which has lasted or is expected to last for twelve or

16  more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in

17  the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

18  step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

19  416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

20  the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

21      Here, the ALJ set forth the applicable law under the required five-step sequential

22  evaluation process. *AR* at 16-17. At Step One, the claimant bears the burden of showing he has not

23  been engaged in "substantial gainful activity" since the alleged date the claimant became disabled.

24  *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial

25  gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had

---

[2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

*United States District Court*
*Northern District of California*

not engaged in substantial gainful activity since the alleged onset date. *AR* at 18. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: major depressive disorder, anxiety disorder, obsessive compulsive disorder, and intellectual disorder. *AR* at 18. Additionally, the ALJ found that the evidence failed to establish any severe personality disorder. *Id*.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 18-21. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of work at all exertional levels but involving only simple repetitive tasks, with no public interaction required, and no more than occasional co-worker interaction. *Id*. at 21-27.

At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work. *Id*. at 27-28. Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff's age, education, and work experience, that there are jobs that exist in significant numbers in which Plaintiff can still perform – namely, the ALJ found that Plaintiff could perform the functions of a cleaner II, a janitor, or a hand packer. *Id*. at 28-29. Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from April 30, 2014, through the date of the issuance of the ALJ's decision, October 11, 2017. *Id*. at 29.

## DISCUSSION

Plaintiff raises three issues and contends that the ALJ erred: by incorrectly weighing the

United States District Court
Northern District of California

1    medical opinion evidence; by failing to fully develop the record; and, by incorrectly evaluating

2    and weighing the credibility of the testimony rendered by Plaintiff and his sister. *See* Pl.'s Mot.

3    (dkt. 18) at 14-28. As for the medical evidence, Defendant responds to the effect that Dr.

4    Severson's opinions were properly discounted by the ALJ because they were "unsupported" and

5    "implausible." *See* Def.'s Mot. (dkt. 27) at 4. Defendant then further justifies the ALJ's rejection

6    of this opinion by contending that "Dr. Severson's evaluation does not [even] constitute a medical

7    'opinion' . . . because it was not supported by the overall record, including Plaintiff's activities of

8    daily living which he performed independently." *Id*. at 5. Specifically, Defendant maintains that

9    the value of Dr. Severson's opinion is diminished by the fact that "Plaintiff was able to go to the

10   store, McDonalds, [and] walk to the park," as well as socializing with his sister and brother-in-

11   law, fixing a bike, and visiting a community center. *Id*. at 5-6. The essence of Defendant's

12   argument in defense of the ALJ's discounting of Dr. Severson's opinion is effectively articulated

13   in the statement that her opinions are "contradicted because Plaintiff's activities show that he was

14   capable of some public contact (going to the park and stores) and able to do some activities such

15   as fixing bikes, which would correspond to unskilled work." *Id*. at 6. Defendant also relies on the

16   notion that Plaintiff "slept eight hours nightly, his delusions decreased, he was much calmer[,]

17   [and that] he had improvement in mood, paranoia and sleep," albeit, Defendant fails to mention

18   that these modest improvements in Plaintiff's emotional condition were observed long *after* his

19   employment had ended. *See id*. at 7. Likewise, Defendant justifies the rejection of the 2017

20   functional limitations opinions (marked limitations in activities of daily living and social

21   functioning) from Plaintiff's treatment providers at Pathways to Wellness because those opinions

22   were purportedly inconsistent with the ability to dine at McDonalds, visit a park, or go to a

23   community center. *Id*. at 8. On the other hand, Defendant justifies rejecting these later-rendered

24   opinions by treating sources, in favor of formulating the RFC purely based on the 2014 opinion of

25   a one-time consultative examination by Dr. Kollath "because it was supported by the overall

26   record and Plaintiff's reported activities of daily living, and the objective findings during the

27   evaluation." *Id*. at 8-10. Further, without mentioning Dr. Akins's 2017 statement that he lacked the

28   information necessary to render an informed opinion, Defendant justifies the ALJ's reliance on the

opinion that Dr. Akins nevertheless rendered because the ALJ considered it to be consistent with the fact that Plaintiff can dine at McDonalds and go to a park or community center. *Id*. at 10-11. Defendant also justifies the ALJ's reliance on the opinions of two non-examining state agency consultants, rendered in late 2014 and early 2015, who reviewed Dr. Kollath's opinion, found it agreeable, and assessed mild and moderate restrictions in various aspects of Plaintiff's functioning. *Id*. at 11-13.

As to Plaintiff's testimony, without specifying what the rejected testimony was, Defendant justifies the ALJ's rejection of it by suggesting that "the ALJ properly concluded that his testimony was inconsistent with his ability to work for several years with the same employer." *Id*. at 14. In short, this portion of Defendant's argument obfuscates what part of Plaintiff's testimony was in fact rejected; and Defendant merely notes that "while Plaintiff had mental impairments, the record supports [the finding] that he quit his job due to mistreatment . . . [and thus] the ALJ reasonably concluded that while Plaintiff could not work for the specific employer, the inability to work for a particular employer does not render Plaintiff incapable of working at all, or establish disability." *Id*. at 13-14. Then, without venturing into any level of detail about the testimony, Defendant merely adds that rejecting Ms. Santos's testimony about Plaintiff's adaptive functioning deficits was proper for two reasons: first, Defendant reasons that the testimony was due to be rejected because "there were no corroborating records . . . [and] the ALJ did not have an independent duty to retrieve those records" (*id*. at 14-15); and, second, Defendant contends that Ms. Santos's testimony about her brother's limitation was contradicted by his ability to dine at McDonald's, fix a bicycle, or spend time at a park (*id*. at 15-16). Lastly, Defendant submits that the ALJ had no duty to develop the record any further than was the case, and that suggesting otherwise "improperly shifts her (sic) burden to the agency," rather than to recognize "Plaintiff's own failure to obtain records to support his claim for disability." *Id*. at 17.

### *Medical Opinion Evidence*

The court will first address the ALJ's rejection of Plaintiff's treating physicians' opinions (from 2017) in favor of the earlier-rendered opinions of a one-time consultative examiner (Dr. Kollath's 2014 opinion), two non-examining state agency consultants' opinions (from 2014 and

2015), as well as Dr. Akins's non-examining opinion that was rendered with the caveat that he had insufficient information on which to offer a well-informed opinion. It should be noted in this regard that medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (9th Cir. 1995); *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006);

1     *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813,

2     818 n.7 (9th Cir. 1993). It should also be noted that greater weight is due to the "opinion of a

3     specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5);

4     *Revels*, 874 F.3d at 654. In situations where a Plaintiff's condition progressively deteriorates, the

5     most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th

6     Cir. 1986).

7          Plaintiff's treating psychotherapist, Dr. Severson, with whom he had an extensive

8     treatment history from 2014 to 2017, diagnosed Plaintiff with an intellectual disability, a severe

9     and recurrent-episode case of major depressive disorder, as well as the possibility that Plaintiff is

10    also afflicted with bipolar disorder[3], histrionic personality disorder, dependent personality

11    disorder, and borderline personality disorder. *AR* at 514. Further, Dr. Severson opined that

12    Plaintiff would be permanently unable to return to work due to the fact that his poor concentration,

13    decreased clarity of thinking, difficulty finding the right words, and problems understanding what

14    other people say all combine to cause Plaintiff to experience overwhelming anxiety, irritability,

15    frustration, anger, panic spells, emotional overreaction, loss of control, involuntary behavior, and

16    compulsive and repetitive behavior. *Id*. at 581, 583. Dr. Severson also opined that due to these

17    cognitive and emotional impairments, Plaintiff risks developing a psychotic episode if he

18    continues to attempt to participate in a similar work environment (i.e., one in which he is not able

19    to be coached on the job by a close family member as had been the case previously). *Id*. at 550.

20    Likewise, in 2017, Plaintiff's clinicians at Pathways to Wellness opined that Plaintiff's cognitive

21    and emotional symptoms caused him to experience marked limitations in activities of daily living,

22    in social functioning, and in terms of episodes of decompensation and the increase of symptoms

23    with extended duration. *Id*. at 640. More notably, Plaintiff's treating nurse practitioner at Pathways

24    to Wellness opined in July of 2017, that Plaintiff's psychosis and delusions had combined to

25    render him "unable to maintain physical / mental hygiene and manage [his] medications," while

26    exhibiting the "repeated presence of psychotic symptoms or suicidal ideation / acts[,] or violent

27

28   [3] It should also be noted that the bipolar diagnosis was confirmed by Plaintiff's physicians at the Alameda
Health System in February of 2016. *See id*. at 628.

United States District Court
Northern District of California

1    ideation or acts to persons [or] property." *Id.* at 641. In short, Plaintiff's treating clinicians

2    concurred that his impairments and symptoms combine in such a way as to render Plaintiff a

3    danger to himself and to others. As discussed above, these opinions were neither contradicted by

4    Dr. Kollath's opinion, rendered three years earlier, nor by Dr. Akins's admittedly poorly-informed

5    non-examining opinion, rendered two months earlier.

6            The ALJ misevaluated each of these opinions, and as such committed a series of errors that

7    infected nearly every step of the sequential evaluation process. First, at Step Two, the ALJ erred

8    by failing to mention Plaintiff's bipolar disorder (of which there was substantial evidence in the

9    record). *Id.* at 18. Second, the ALJ erred by finding Plaintiff's well-documented dependent and

10   borderline personality disorders to be non-severe based on the reasoning that Plaintiff's

11   "symptoms appear to be related primarily to OCD and MDD," and in doing so, the ALJ ignored

12   the medical evidence of record and appears to have substituted his own lay opinion for those of an

13   expert in the field of psychotherapy. *See id.* Thereafter, at Step Three, the ALJ found that

14   Plaintiff's condition did not meet or equal the intellectual disability listing by first rejecting the

15   virtual entirety of medical evidence and opinions from Plaintiff's treating sources, and instead

16   finding that Plaintiff only experienced mild limitations in understanding, remembering, or

17   applying information, and only moderate limitations in social interaction, adapting or maintaining

18   himself, and in concentrating, persisting, or maintaining pace. *Id.* at 19-20. These findings were

19   not based on substantial evidence in the record, but were instead based on isolated snippets of

20   information, taken out of context, such as the notions that at various times Plaintiff was known

21   for: getting along with his family members; being cooperative during Dr. Kollath's evaluation;

22   doing yard work at his mother's house; walking to the park; or, that Plaintiff was even "dressing

23   and bathing himself." *Id.* at 19. The ALJ also made much of the fact that, despite achieving only a

24   full scale IQ score of 51, Plaintiff was nevertheless "able to participate in a standardized testing of

25   intellectual functioning at a 2014 consultative psychological examination," however, the ALJ was

26   able to overlook the extremely low score of 51 due to Dr. Kollath's unexplained notation to the

27   effect that the score appeared to be an unreliable representation of Plaintiff's state of psychological

28   functioning. *See id.* at 20. The ALJ even managed to discard Dr. Kollath's notation that Plaintiff's

United States District Court
Northern District of California

16

1    history and clinical presentation were indicative of the existence of a neurocognitive disorder by

2    focusing on the fact that Dr. Kollath only identified this as a possibility based on a perception and

3    that she seemed uncertain – therefore, the ALJ simply discounted it as an errant musing and not a

4    diagnostic impression. *See id*.

5        In weighing the medical opinion evidence, the ALJ gave significant weight to the non-

6    examining opinion rendered by Dr. Akins, despite the fact that "he did not have the entire record

7    to review at the time and did not personally evaluate the claimant." *Id*. at 26. The ALJ's stated

8    reason for giving "significant weight" to an opinion that was admittedly based on "insufficient

9    evidence to offer well-informed opinions," was once again based on taking isolated snippets out of

10   context, such as the fact that Plaintiff has previously gone shopping or that he has been able to

11   interact with his evaluators. *Id*. The ALJ also gave significant weight to the opinions of two non-

12   examining state agency consultants, rendered in late 2014 and early 2015, who reviewed Dr.

13   Kollath's opinion, found it agreeable, and assessed only mild and moderate restrictions in various

14   aspects of Plaintiff's functioning. *Id*. at 26-27. Once again, the ALJ based the weight that was

15   given to these non-examining opinions – which significantly predated the opinions rendered by

16   Plaintiff's treating physicians – by relying on the above-discussed isolated snippets from various

17   parts of the record that were taken out of context, such as the fact that Plaintiff could go to the

18   park or dine at McDonalds.

19       As, to the opinions of Dr. Severson and Plaintiff's treating clinicians at Pathways to

20   Wellness, the ALJ afforded these later-rendered opinions little weight. *Id*. at 27. The rejection of

21   Dr. Severson's opinion was based on a vague and generalized statement, explaining merely that

22   the ALJ found "her opinion to be inconsistent with the overall record," by which the ALJ

23   presumably meant to refer to the isolated out-of-context snippets of information discussed above.

24   *Id*. at 27. The only other reasoning given by the ALJ for rejecting Dr. Severson's opinion was the

25   incorrect notion that it was "largely based on the claimant's subjective allegations and there are no

26   longitudinal mental health treatment records supporting the opinion." *Id*. Likewise, the court finds

27   this reasoning to be non-specific and illegitimate. First, the ALJ's patently incorrect

28   characterization of the "longitudinal medical record" requires no discussion as the records and

United States District Court
Northern District of California

17

opinions of each of Plaintiff's treating sources, as well as the lay accounts of his sister's testimony, as well as the specifics of Plaintiff's interactions with the ALJ at both hearings, all present the same impression – namely, that of a person who suffers from an intellectual disability that has also given rise to a series of severe emotional impairments. Second, it is inherent in the nature of the discipline, and should not even need to be noted that while "[p]sychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields[,] [d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient . . . [because] such is the nature of psychiatry." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017); *see also Poulin v. Bowen*, 817 F.2d 865, 873 (1987) ("[U]nlike a broken arm, a mind cannot be x-rayed."); *see also Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 185 (N.D.N.Y. 2019) ("[i]nterviewing a patient and assessing her subjective self-reported symptoms can be an acceptable diagnostic technique when the condition complained of involves a substantial subjective component"). Thus, the ALJ's reason for rejecting Dr. Severson's opinions did not even approach the specific and legitimate standard, let alone the clear and convincing standard. The ALJ's rejection of the opinion of Plaintiff's treating clinician at Pathways to Wellness fared no better. *See AR* at 27. The ALJ afforded this opinion "little weight" because of the same repeated and erroneous justification that the opined limitations "sharply contrasted" with the "many activities of daily living that he is able to perform independently, including attending events at the community center with his mother, shopping, and going for walks to the park." *Id*. Once again, this reasoning is neither specific nor legitimate (let alone clear and convincing) – that Plaintiff was able to attend an event with his mother, or that he was able to walk to a park, in no way diminishes the opinions of his treatment providers about his cognitive and emotional impairments, the interactions of their symptoms, or the resulting limitations which they cause. Because the court has found that the ALJ improperly rejected the above-described opinions from Plaintiff's treating sources, those opinions will now be credited as true as a matter of law. *See generally Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *Smolen v. Chater*, 80 F.3d 1273, 1291-92 (9th Cir. 1996); *Lester*, 81 F.3d at 834; *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir.

United States District Court
Northern District of California

1989).

**Lay Witness Testimony**

Lay-witness testimony regarding a claimant's symptoms is competent evidence that must be considered unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The reasons advanced for rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). Germane reasons for discrediting such testimony could include inconsistency with the medical evidence, or the fact that the testimony "generally repeat[s]" the properly discredited testimony of a claimant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). Also, it is important to note that the mere lack of support from medical records is not a germane reason to discount lay-witness testimony. *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017).

Here, the ALJ did not expressly reject Ms. Santos's testimony in clear and unequivocal terms. Instead, the ALJ merely noted that "while Ms. Santos testified to a protected environment for many years due to the presence of the claimant's father in the workplace, there is no objective evidence of any particular workplace accommodations, special treatment, or other support given the claimant that would tend to demonstrate the work was akin to that in a 'sheltered workshop.'" *AR* at 26. First, Ms. Santos's testimony was far more broad than this, in that she testified at length about Plaintiff's symptoms and his limitations in adaptive functioning and in other areas – none of which the ALJ ventured to discuss. Second, the court finds that the ALJ's reasoning in rejecting even this portion of Ms. Santos's testimony is neither specific, nor germane to this witness. Thus, because Ms. Santos's testimony was improperly rejected, largely by implication and without discussion, that testimony will now be credited as true as a matter of law. *See Schneider v. Commissioner of Social Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000) (crediting lay witness evidence the ALJ rejected and remanding case for payment of benefits)

**Nature of Remand**

The decision whether to remand for further proceedings or for payment of benefits generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

1   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

2   been fully developed and where further administrative proceedings would serve no useful

3   purpose." *Smolen*, 80 F.3d at 1292.

4          The Court of Appeals for the Ninth Circuit has established a three-part test "for

5   determining when evidence should be credited and an immediate award of benefits directed."

6   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of

7   benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for

8   rejecting such evidence; (2) there are no outstanding issues that must be resolved before a

9   determination of disability can be made; and, (3) it is clear from the record that the ALJ would be

10  required to find the claimant disabled were such evidence credited. *Id*. The second and third

11  prongs of the test often merge into a single question; that is, whether the ALJ would have to award

12  benefits if the case were remanded for further proceedings. *Id*. at 1178 n. 2; *see also Garrison*, 759

13  F.3d at 1021-23 (when all three conditions of the credit-as-true rule are satisfied, and a careful

14  review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a

15  remand for a calculation and award of benefits is required).

16         Here, even if the ALJ had not erred at Step Two by failing to consider Plaintiff's bipolar

17  disorder at all or by erroneously finding his personality disorder to be non-severe, and even if the

18  ALJ's erroneous rejection of Plaintiff's treating sources did not render his Step Three

19  determination erroneous (i.e., Plaintiff's impairments here quite likely meet or equal the

20  intellectual disability listing), and even if the ALJ's incorrectly formulated RFC were to be

21  accepted, the VE testimony established that if someone with Plaintiff's age and experience were to

22  be off task 15 to 20 percent of the time, or absent 1 or more days per month, there would be no

23  work for such a person in the national economy. *See AR* at 117-18. Plaintiff's treating sources

24  found that he experienced marked limitations in his activities of daily living and social

25  functioning, and also with respect to his episodes of decompensation.[4] A "marked" limitation has

26

27  ──────────────────
    [4] "Episodes of decompensation" are defined as "exacerbations or temporary increases in symptoms or signs
    accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of
28  daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *See
    generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04; *see also id*. at § 12.00 (C)(4).

United States District Court
Northern District of California

1    been defined as characterizing one or more impairments that "interferes seriously" with the ability

2    "to independently initiate, sustain, or complete activities." *See e.g.,* 20 C.F.R. § 416.926a (e)(2).

3           In light of the above-discussed and improperly discredited medical opinion testimony, as

4    well as the improperly rejected lay testimony, and the VE's testimony, the ALJ would clearly be

5    required to find Plaintiff disabled on remand because the improperly rejected evidence established

6    marked limitations in his abilities regarding activities of daily living, social functioning, and

7    episodes of decompensation, as well as the repeated presence of psychotic symptoms as well as

8    suicidal and violent ideations that could cause Plaintiff to become a danger to himself as well as

9    others, and for which reason Dr. Severson opined that he is unable to function in the workplace

10   setting at all, and stands at risk of developing a psychotic episode if left to his own devices in such

11   a setting. *See id*. at 550, 640-641. It should also be noted that the opinion evidence from Plaintiff's

12   treating sources – that he is incapable of functioning in the workplace at all – was corroborated

13   and confirmed by Ms. Santos's testimony as described above. Further, at least with respect to

14   Plaintiff's impaired faculties of comprehension and communication, the work-preclusive opinions

15   of his treatment providers and his caretaker, Ms. Santos, were likewise confirmed by the utter

16   inability of his counsel or the ALJ to communicate with Plaintiff in any meaningful way during

17   either of the two hearings.

18          Thus, as noted, the court concludes the ALJ erred when he failed to provide legally

19   sufficient reasons supported by substantial evidence in the record for discounting the opinions of

20   Plaintiff's treating sources regarding his limitations. The ALJ also erred when he implicitly

21   rejected, by failing to discuss and consider, the vast majority of Ms. Santos's testimony; testimony

22   which was not only consistent with the opinions of Plaintiff's treatment providers, but in fact

23   placed those opinions in context by describing the extent of Plaintiff's deficits in adaptive

24   functioning. Accordingly, the court concludes that after careful consideration of the record as a

25   whole, it is clear that the ALJ would be required to find Plaintiff disabled and to award benefits if

26   this improperly rejected evidence was credited as true; and further, the court finds that the record

27   is such that there is no reason to doubt that Plaintiff is in fact disabled.

28          The court will note that in cases where each of the credit-as-true factors is met, it is

United States District Court
Northern District of California

21

generally only in "rare instances" where a review of the record as a whole gives rise to a "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing *Garrison*, 759 F.3d at 1021). The case at bar is not one of those "rare instances." It should also not go without mention that the case authorities in this Circuit do not support remanding this case to give the Commissioner another opportunity to meet his burden. *See Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *see also Rustamova v. Colvin*, 111 F. Supp. 3d 1156, 1165 (D. Or. 2015).

<strong>CONCLUSIONS</strong>

For the above-discussed reasons, the court **REVERSES** the decision of the Commissioner and **REMANDS** this matter for the immediate calculation and payment of benefits.

**IT IS SO ORDERED.**

Dated: May 21, 2020

ROBERT M. ILLMAN
United States Magistrate Judge